**Exhibit #9 - "Discovery Letter to Respondents Re Spoliation"**

LISA M. COYLE
212 980 7468 TEL
LCOYLE@ROBINSKAPLAN.COM

August 17, 2018                                               *Via E-Mail*

Linda C. Goldstein
Dechert LLP
1095 Avenue of the Americas
New York, NY 10036

    Re: *Fox News Network, LLC v. Andrea Tantaros, Case No. 01-16-0001-7288*

Dear Linda:

    I write in response to: (i) Claimant and Counterclaim-Respondents' Objections and Responses to Andrea Tantaros' First Demand for Production of Documents, dated June 19, 2017 ("First Document Objections"); (ii) your July 17, 2018 letter regarding Ms. Tantaros' document requests and proposed search parameters (the "Letter";) (iii) Objections and Responses of Claimant and Counterclaim-Respondent Fox News Network, LLC and Counterclaim-Respondents Brandi, Briganti and Scott to Tantaros' Second Demand for Production of Documents, dated July 30, 2018 ("Second Document Objections"); and (iv) Objections of Claimant and Counterclaim-Respondent Fox News Network, LLC and Counterclaim-Respondents Brandi, Briganti, and Scott to Tantaros' First Set of Interrogatories, dated July 30, 2018 ("Interrogatory Objections").

    **1. Purportedly Unavailable Document Sources:** At the outset, I would appreciate clarification regarding two sources of documents that the Letter identifies as no longer available to Fox News Network, LLC ("Fox"): (1) records of communications made using Fox's internal instant messaging system, "Topline"; and, (2) the Fox e-mail inboxes and/or other custodial documents of Felipe Tognarelli, a/k/a Felipe Verduba ("Tognarelli") and Bruce Backman ("Backman").

        *a. Topline:* It is our understanding that Fox employees, including executives, used this internal messaging system as the primary written means of communication with one another because *Fox discouraged the use of email by its employees*. Moreover, Fox has been on notice of Ms. Tantaros' sexual harassment claims since – at the very latest – February 2015. Indeed, news reports from July 2016 – several months prior to when Fox terminated Ms. Tantaros' contract – indicate that Fox had already retained outside counsel to investigate various sexual

August 17, 2018 VIA E-MAIL
Page 2

harassment claims against Fox by that point.[1] As you know, document preservation obligations include an obligation to suspend any "auto-delete" functions and ordinary course deletion schedules that a company may have in place once there is a reasonable likelihood of litigation. *See, e.g., VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.,* 293 A.D.3d 33, 41-42 (1st Dep't 2012) ("Once a party reasonably anticipates litigation, it must, at a minimum, institute an appropriate litigation hold to prevent the routine destruction of electronic data. . . . The hold should, with as much specificity as possible, describe the ESI at issue, *direct that routine destruction policies such as auto-delete functions and rewriting over e-mails cease*, and describe the consequences for failure to so preserve electronically stored evidence.") (emphasis added); *Bricklayers Ins. & Welfare Fund v. P.P.L. Constr. Servs. Corp.*, Case No. 12-cv-3940, 2016 U.S. Dist. LEXIS 45265, at *17 (E.D.N.Y. Mar. 31, 2016) ("'[O]nce a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents.'" (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 212 (S.D.N.Y. Oct. 22, 2003))).

Accordingly, your statement that Fox is not currently retaining "Topline messages for more than one day," is astonishing given the pendency of this arbitration (as well as other sexual harassment cases) and your clients' indisputable document preservation obligations arising out of those matters. Please explain when and why Fox made the decision not to preserve this critical source of information.

Moreover, we are having trouble reconciling your representation that Topline messages are inaccessible with Bill Shine's production, which appears to include six Topline messages over separate days in August 2016. (BS0001-03). Thus, we would also appreciate any clarification that you can provide as to how Fox itself purportedly cannot produce these messages even though they appear to somehow be available to Mr. Shine.

***b. Tognarelli and Backman Inboxes:*** As you are undoubtedly aware, it has been widely documented that, while Roger Ailes was CEO of Fox, there was a team of Fox employees and third party consultants at Fox headquarters who, acting at Ailes' direction, engaged in public relations campaigns against targets selected by Ailes, and that this team was commonly referred to as the "Black Room."[2] For example, the complaint in a derivative action filed by shareholders of

---

[1] *See, e.g.,* https://www.politico.com/media/story/2016/07/report-fox-retains-paul-weiss-to-look-into-ailes-claims-004663.
[2] See http://nymag.com/daily/intelligencer/2016/08/ailes-used-fox-budget-to-finance-campaigns-against-enemies.html; https://www.esquire.com/news-politics/news/a47405/roger-

Fox's parent company, Twenty-First Century Fox, Inc., which settled last year for $91 million, states:

> Ailes actually established a formal department dedicated to surveillance known as "The Black Room." The Black Room was an operation Ailes established around 2011 to conduct public relations and surveillance campaigns against people he targeted, both inside and outside [Twenty-First Century Fox]. It was located on the 14th floor of the News Corp. building at 1211 Avenue of the Americas, a quiet part of the office that housed Fox News Latino and some marketing and promotions employees. Fox employees Ken LaCorte and Jim Pinkerton – veteran political operatives who have worked with Ailes since the 1980s – also worked with Bert Solivan, one of Ailes's consultants, in the Black Room. According to two Fox executives, Pinkerton wrote an anonymous blog called the Cable Game that attacked Ailes-selected targets. [Twenty-First Century Fox] produced records that show Fox News [Channel] made multi-million dollars payments annually to finance the Black Room.
>
> According to Ailes's 2015 employment agreement, the Board approved budgets for Fox News [Channel]. While not specifically delineated, those budgets included amounts of money to fund the surveillance described above. As such, the Board either knew or should have known that Ailes sought to undermine [Twenty-First Century Fox's] reporting mechanisms and put in place surveillance measures designed to intimidate Fox News [Channel] employees into not reporting any misconduct by Ailes or his loyalists and enablers.

*City of Monroe Employees' Retirement System, derivatively on behalf of Tenty-First Century Fox, Inc. v. Murdoch et al.*, Case No. 2017-0833 (Del. Ct. Chancery) Compl., Compl. ¶¶ 133-134. In addition, there has been extensive documentation of the Black Room's existence and activities in multiple media outlets. For example, one press report notes that:

> During the Ailes era, the network's ferocity in defending itself against inconvenient facts and journalists it deemed unfair

---

ailes-black-room-follow-journalists/; and, http://nymag.com/daily/intelligencer/2016/08/more-revelations-about-ailess-black-room-tactics.html.

became legendary among the small group of people who cover the media business. Under its former head, the network employed a team of "black room" operators who allegedly obtained phone records and credit reports of reporters disliked by Ailes. According to news reports, private investigators working for the company were dispatched to follow journalists, apparently to find out whom they were meeting. . . .

That ultra-aggressive approach to promotion during the Ailes era also extended to the online world, where Fox News employees and contractors were dispatched to do battle against not just mainstream media reporters but also against small-time bloggers and even website commenters. Fox News even went so far as to create at least two anonymous websites that attacked the competition. This strategy of online fakery — a practice known as creating "sock puppet" accounts, in internet parlance — was an outgrowth of the corporate culture established by Ailes when he launched the channel at the behest of media mogul Rupert Murdoch in 1996.[3]

As detailed in Ms. Tantaros's counterclaims, she was targeted by Fox's "Black Room" in retaliation for her reports of sexual harassment. *See, e.g.*, Ms. Tantaros's Answer to Amended Demand for Arbitration and Counterclaims Ex. A ¶¶ 6, 29-31, 35-37, 39, 48, 50-53, 69. Thus, discovery into Fox's "Black Room" – including key "Black Room" employees like Tognarelli and Backman – is highly relevant to Ms. Tantaros' retaliation claims.

I therefore respectfully request that you clarify your statement that these custodians' Fox inboxes are "no longer available to Fox." Specifically, please explain when, and the manner in which, their inboxes ceased to be available to Fox, and please identify any individuals or entities to whom their inboxes are currently available.

**2. Custodians:** While I appreciate that you have now agreed to search all of the custodial records for the parties in this case, as well as their assistants and three Fox media relations staffers, I respectfully disagree with your assertion that such a search is anything more than the bare minimum discovery that Fox should undertake in this case, and cannot imagine why a search of a few additional custodians would be "unduly burdensome." Indeed, as detailed in Ms. Tantaros' counterclaims and a number of contemporaneous news reports, some of which are cited above, Fox's retaliation against victims of sexual harassment like Ms. Tantaros

---

[3] *See* https://www.salon.com/2017/04/18/roger-ailes-fake-news-blogs-sockpuppet/.

was perpetrated through not only the counterclaim-defendants, but also numerous subordinates. Discovery into those subordinates' records is thus highly relevant to Ms. Tantaros' claims.

Although Ms. Tantaros believes that all of the custodians she identified to which Fox has objected have relevant materials in their custodial records, in the spirit of compromise, Ms. Tantaros is willing to narrow her request to, in addition to the custodians Fox has already agreed to search, the following four individuals: (1) Tognarelli; (2) Backman; (3) Deborah Sadusingh, who also was involved in the "Black Room;" and (4) Kimberly Guilfoyle. Please let me know if you will consent to search the custodial records for these individuals.

**3. Personal Email Accounts.** Please confirm that you have searched, or will search, the personal email accounts of each of the custodians you have agreed to, in addition to their Fox email accounts. Please also provide a list of the email accounts that were searched for each of the custodians to which you have agreed.

**4. Domestic and International Servers.** It is our understanding that certain of Fox's data was recently transferred from servers in the United States to servers in the United Kingdom. Please confirm that you have searched all servers that hold custodial information for the custodians you have agreed to regardless of whether such servers are located in the United States or abroad.

**5. Relevant Time Period:** Your letter appears to state that Fox's document production will be limited to the time period of January 1, 2014 - May 15, 2017, despite our request for records through the present. However, in both their First Objections and their Second Objections, Counterclaim-Respondents agreed to produce documents through the present. *See* First Objections ¶11 ("Unless otherwise stated below, Defendants will produce responsive documents dated January 1, 2014 *to the present*." (emphasis added)); Second Objections ¶ 12 (same). Moreover, relevant documents and/or communications are likely still being generated by, among other sources, ongoing investigations into sexual harassment at Fox. Thus, we respectfully request that you expand your search for relevant documents through the present, as you previously agreed to do.[4]

**6. Capitalized Search Terms:** While we appreciate the challenges that can sometimes accompany case-specific search terms, the two capitalized terms to which you object – "AT" (Ms. Tantaros's initials) and "FOR" (an acronym for "Friends of Roger") – are highly relevant to this case. In particular, our review of

---

[4] As a result of the statement in your letter that you would only agree to produce documents through May 15, 2017, Ms. Tantaros's productions in this matter to date have also been limited to that time frame. Ms. Tantaros is prepared, however, to produce documents through the present, provided that the Counterclaim-Respondents confirm their willingness to do the same.

the documents produced to date reveals that Ms. Tantaros is frequently referred to as "AT" in lieu of "Andrea" or "Tantaros." Thus, from our perspective, "AT" is one of the most (if not the most) critical search terms in this case.

Accordingly, please identify your document review platform. In point of fact, there are technical solutions that can enable reliable case-specific searching in the most common document review platforms, and thus we would appreciate the opportunity to meet and confer with you and your e-discovery personnel, if any, regarding potential ways to approach this issue.

**7. Other Search Terms:** While you generally object to a number of our proposed search terms as either irrelevant or unduly burdensome, we wholeheartedly disagree with your characterization of these terms. Although we are certainly willing to agree to modify our requested list of search terms in light of your concerns, we cannot consent to your extremely narrow list of proposed search terms. Instead, in addition to the few terms you have consented to run, we request that you also reconsider running the following search terms:

*a. Terms Related to the "Black Room":* Jamespinker@mac.com; Bo; Dietl;[5] Johnson; PJJ; Sherman; Backman; Tognarelli; Bacher; Mediaite; Abrams; The Wrap; Hot Air; Duy; Vuitton; Variety; Steinberg; Baker; Hadas; Fields; Gardner; Hack!; Surveil!; Pineapple; Keystroke; @SayoPX.

*b. Terms Related to Sexual Harassment at Fox News*: Diva;[6] Huddy; Dhue; Holder; Roginsky; Powers; Sivan; Bakhtiar; Steel; Wiehl; Finley; Boothe; LMB; US Attorney; EEOC.

We would be happy to meet and confer with you to provide additional detail regarding the relevance of each of the above search terms to the claims in this case, and to explore potential ways to limit the burden associated with using such terms to locate responsive documents.

**8. Media Relations Custodians:** Although you have agreed to search the custodial files of Jessica Jensen, Carly Shanahan, and Dana Klinghoffer, we object to both your proposed time period (January 1, 2014 - May 11, 2016) and narrow list of search terms for these custodians. As an initial matter, this proposed time period ends well short of the date Fox terminated Ms. Tantaros' contract; thus she was still an employee at that time. Moreover, retaliation from both the media relations

---

[5] Bo Dietl has admitted to being hired by Fox to investigate Ms. Tantaros, among other sexual harassment victims. *See* https://www.nytimes.com/2017/06/24/nyregion/bo-dietl-new-york-mayor.html. It is thus beyond dispute that this search term is relevant to Ms. Tantaros's claims for retaliation.

[6] It is our understanding that women who reported sexual harassment at Fox were often referred to as "divas."

department and the still operational Black Room has continued through the present. Thus, your position certainly excludes relevant communications, and we request that you search these custodians' files, as with the other custodians, from January 1, 2014 to the present. We are aware that Ms. Klinghoffer departed Fox for NBC to work with Megyn Kelly, another sexual harassment accuser, and that Ms. Kelly has publicly stated on her television program as recently as October 2017 that Fox – specifically counterclaimant Briganti – continues to target and attack accusers. It is thus indisputable that this information is relevant.

As for your narrow list of search terms for these custodians, we request an opportunity to meet and confer with you as to our objections.

**9. Video Footage:** We note that, despite our requests, Fox has not yet produced any video footage related to this matter, including programming on which Ms. Tantaros mentioned her then-forthcoming book, *Tied Up In Knots*. As your letter makes no mention of video files, please confirm that this production is forthcoming.

**10. First Document Objections:** Your First Document Objections include a number of objections and/or other proposed limitations to Ms. Tantaros' requests for production that are unreasonable:

*a. Request Nos. 4, 23:* In response to these requests, you state that you will produce non-privileged responsive documents that can be located through a reasonable search of the files of Shine, Scott, Briganti, Brandi and Ailes. As you have since agreed to additional custodians, please confirm that you will search the files of *all* custodians to which you have agreed for documents responsive to these Requests.

*b. Request Nos. 7-13, 32:* These Requests seek information related to claims of sexual harassment, discrimination, or retaliation made by employees of Fox News.

First, please clarify that you *will* produce non-privileged documents responsive to Request Nos. 8-13 *to the extent such documents relate to Ms. Tantaros*, as there can be no serious dispute that such documents go to the core of this case.

Second, although you object to Request Nos. 7-13 and 32 on relevance grounds to the extent they seek documents related to Fox employees *other than Ms. Tantaros*, discovery of such information is in fact critical to Ms. Tantaros' claims that Defendants created a hostile work environment at Fox where sexual harassment was prevalent, normalized, accepted, and covered-up. *See, e.g., Preuss v. Kolmar Labs., Inc.*, 970 F. Supp. 2d 171, 186 (S.D.N.Y. 2013) (noting that "[e]vidence of harassment directed at other co-workers can be relevant to an employee's own claim of hostile work environment discrimination" and that a

"plaintiff who experiences harassment can rely on incidents directed toward other targets") (collecting cases); *Matter of Eastport Assocs., Inc. v. N.Y. State Div. of Human Rights*, 71 A.D.3d 890, 891 (2d Dep't 2010) ("Sexual harassment based upon a hostile work environment exists under Executive Law § 296(1) when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult' that is sufficiently severe or pervasive to alter the terms or conditions of employment.'"). Nor have you identified any right of privacy that prevents discovery of this information. Indeed, the identities of many of these claimants have been widely reported and, even to the extent they have not been, we remind you that this arbitration is entirely confidential and that a protective order is in place to protect such information.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

*c. Request Nos. 14, 16*: These requests seek documents concerning the end of Roger Ailes's and William Shine's employment by Fox. Although you state that you will only produce documents responsive to these requests to the extent they refer to Ms. Tantaros or her claims, documents referencing any other employee who complained of sexual harassment, discrimination, or retaliation are also relevant for the reasons stated in the preceding paragraph. *See, e.g.*, *Preuss*, 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891. Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

*d. Request Nos. 15, 17*: These Requests seek documents concerning: (i) the promotion of William Shine to co-President of Fox after the end of Roger Ailes's employment by Fox; and (ii) the end of any Fox employee's employment following an investigation of such employee for alleged sexual harassment, discrimination, or retaliation. Once again, these documents are highly relevant to Ms. Tantaros' claims that Defendants created a hostile work environment at Fox in which sexual harassment, discrimination, and retaliation was condoned and, indeed, rewarded, rather than punished, for the reasons stated in paragraph (b) above. *See, e.g.*, *Preuss*, 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891. Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

*e. Request Nos. 18, 22, 24*: These Requests seek documents concerning Fox's investigation of, and use of sockpupets against, its Employees, including Ms.

Tantaros. Such documents are clearly relevant to Ms. Tantaros' claims pertaining to harassment and retaliation perpetrated against her by Fox's media relations department and "Black Room," acting at the direction of Roger Ailes. Accordingly, we ask that you reconsider your position and confirm that you will produce documents responsive to these requests.

 *f. Request No. 19:* This Request seeks documents concerning Fox's investigation of Ms. Tantaros's claims of sexual harassment and retaliation – documents which indisputably go to the core of Ms. Tantaros' case. Although *some* of those documents may be privileged, it is patently unreasonable to refuse to search for these highly relevant and, indeed, critical, documents on privilege grounds alone. Accordingly, please confirm that you will produce non-privileged documents responsive to this Request, and log any documents responsive to this request that are withheld on privilege grounds.

 *g. Request No. 20:* This Request seeks documents concerning communications between Fox and reporters, bloggers, or other media outlets. While we do not object to your limitation of this request to communications concerning Ms. Tantaros, your response is unreasonably limited to communications involving Briganti. Other Fox employees almost certainly had communications with reporters, bloggers, and other media outlets concerning Ms. Tantaros. Accordingly, please confirm that you will produce responsive documents irrespective of whether it was Briganti or another Fox employee who was involved in the communication at issue.

 *h. Request No. 33*: This Request seeks information necessary to test the veracity of Fox's claim that Ms. Tantaros was suspended as a result of alleged violations of Fox's book guidelines. Whether other, male, Fox television hosts were required to and did follow such guidelines, and whether any disciplinary actions were taken – or not taken – against them as a result, is highly relevant to Fox's contention in this regard. Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

 **11. Second Document Objections:** Your Second Document Objections also include a number of objections and/or other proposed limitations to Ms. Tantaros' requests for production that are unreasonable:

 *a. Request No. 4:* This Requests seeks documents concerning investigations by Third Parties at Fox's direction of Fox employees who have made claims of sexual harassment, discrimination, and/or retaliation.

First, please clarify that you *will* produce non-privileged documents responsive to this Request *to the extent such documents relate to Ms. Tantaros*, as there can be no serious dispute that such documents go to the core of this case.

Second, although you object to this Request on relevance grounds to the extent it seeks documents related to Fox employees *other than Ms. Tantaros*, discovery of such information is in fact critical to Ms. Tantaros' claims for the reasons stated in paragraph 10(b) above. *See, e.g.*, *Preuss*, 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891. Nor have you identified any right of privacy that prevents discovery of this information. Indeed, the identities of many of these claimants have been widely reported and, even to the extent they have not been, we remind you that this arbitration is entirely confidential and that a protective order is in place to protect such information.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

**b. Request Nos. 6, 9, 15**: These Requests seek documents concerning the use by Fox of sockpuppets and/or websites to post about Ms. Tantaros; communications between Fox's attorneys and Michael Krechmer, a/k/a Michael Malice and/or his attorneys, in which Fox was trying to obtain damaging or embarrassing information about Ms. Tantaros; and documents concerning the "Black Room." These documents are clearly relevant to Ms. Tantaros' claims pertaining to harassment and retaliation perpetrated against her by Fox's media relations department and "Black Room," acting at the direction of Roger Ailes. Accordingly, we ask that you reconsider your position and confirm that you will produce documents responsive to these requests.

**c. Request No. 11**: This Request seeks documents concerning Fox's approval of two books and a photo shoot by other current and former Fox television hosts. This information is necessary to test the veracity of Fox's (we believe pre-textual) claim that Ms. Tantaros was suspended as a result of her alleged violation of Fox's book guidelines. For example, Fox has alleged that the cover of Ms. Tantaros's book, in which she appears fully clothed in a dress consistent with those worn by female hosts on Fox television shows, was "inconsistent with her professional image." However, Fox apparently approved a book cover in which another female Fox television host, Lisa Kennedy Montgomery, a/k/a "Kennedy," appeared fully naked on a horse with the side of her breast visible, as well as a photo shoot in which yet another former female Fox television host, Megyn Kelly, appeared in revealing lingerie. Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents

responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

   *d. Request No. 16*: This Request seeks documents concerning Fox's annual "trunk shows" at which female on-air personalities picked out their wardrobes. Such documents relate to Ms. Tantaros' claims that Defendants created a hostile work environment at Fox at which sexual harassment was pervasive and condoned. Your purported limitation to documents referencing Ms. Tantaros is unreasonable as the annual "trunk show" involved all of Fox's on-air female personalities, and the treatment of such other women is relevant for the reasons set forth in paragraph 10(b) above. *See, e.g.*, *Preuss*, 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891. Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to these requests so that we may avoid burdening the Panel with a motion to compel these documents.

   *e. Request No. 17*: This Request seeks documents concerning any deletion of data potentially responsive to Ms. Tantaros's document requests, and your Response states that you "do not believe that there is any deleted data" because, "[a]mong other reasons, on September 1, 2016, the Fox Parties issued a Records Preservation Notice in connection with this litigation 'to ensure that all relevant documents and records are preserved.'"

   It is our understanding that Fox remotely deleted data from Ms. Tantaros's blackberry on April 25, 2016, the day she was taken off the air, but while she remained an employee of Fox. Moreover, as set forth above, your Letter acknowledges that Fox has been deleting relevant data for quite some time – including, at the very least, Topline messages that are more than one day old – notwithstanding Fox's indisputable document preservation obligations arising from this arbitration and other sexual harassment litigation. Indeed, it is highly troubling that Fox did not issue a Records Preservation Notice until September 1, 2016 – *more than a year and a half after* Ms. Tantaros first complained internally about sexual harassment and retaliation at Fox, and *more than two months after* Fox itself had hired outside counsel to investigate Ms. Tantaros's and other women's allegations of sexual harassment. Thus, your representation that "Fox Parties [] do not believe that there is any deleted data" is patently inaccurate.

   Moreover, your objection that documents related to Fox's deletion of data relevant to this arbitration in violation of its discovery obligations "are not relevant to this case" is beyond absurd.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to this Request so that we may avoid burdening the Panel with a motion to compel these documents.

*f. Request No. 19*: This Request seeks tapes or other recordings from overt or hidden cameras that existed in or had a view of Ms. Tantaros's office. Please confirm that the statement in your Response that there "are no such documents" is a representation that there were no overt or hidden cameras that existed in, or had a view of, Ms. Tantaros' office during her employment at Fox. If that is not the case, please explain how there could be no such documents.

*g. Request No. 20:* This Request seeks employment agreements between Fox and: (i) Roger Ailes; (ii) Bill O'Reilly; (c) Bill Shine; (d) Irena Briganti; (e) Dianne Brandi; and/or (f) Suzanne Scott.

First, it is our understanding that Roger Ailes's employment agreement with Fox provided that he could not be terminated for sexual harassment unless he was found guilty of having engaged in such conduct *in an open court of law*, notwithstanding that all of Fox's employment agreements contain arbitration clauses precluding employees from bringing sexual harassment claims in court in most instances. This provision therefore effectively constituted a license issued to Mr. Ailes by Fox which enabled him to sexually harass Fox employees with impunity. Mr. Ailes's employment agreement is thus crucial to Ms. Tantaros's claims that Fox created a hostile work environment where sexual harassment was prevalent, normalized, condoned, and covered-up, and therefore this document must be produced. *See, e.g.*, *Preuss*, 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891.

Second, Bill O'Reilly, like Mr. Ailes, has been accused of sexual harassment by multiple Fox employees and there is reason to suspect that he had a similar "license to harass" built into his employment agreement with Fox, which would be equally critical to establishing Ms. Tantaros's claims. And, since Bill Shine, Irena Briganti, Dianne Brandi, and Suzanne Scott are all accused of acting as Mr. Ailes's enablers by covering up his sexual harassment and punishing those who accused him of it, there is strong reason to suspect that they too may have had such protective clauses in their employment agreements with Fox.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to this Request so that we may avoid burdening the Panel with a motion to compel these documents.

*h. Request Nos. 21-22.* These Requests seek documents concerning Fox's settlement of the Shareholder Derivative Action for $91 million in 2017, as well as the settlement and/or severance agreements between Fox and (i) Roger Ailes; (ii)

Bill O'Reilly; (iii) Bill Shine; (iv) Megyn Kelly; and/or (v) Francisco Cortez. These documents all relate to Ms. Tantaros' claims that Defendants created a hostile work environment at Fox, and thus must be produced for the reasons set forth in paragraph 10(b) above. *See, e.g., Preuss,* 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to this Request so that we may avoid burdening the Panel with a motion to compel these documents.

***i. Request No. 23***: This Request seeks documents concerning any Fox dress code or wardrobe handbook and/or violations of the same, and your Response indicates that you will only produce responsive documents concerning violations of a dress code or wardrobe handbook to the extent such violations were by Tantaros. This limitation is unreasonable as Defendants' conduct with respect to other employees' purported violations is relevant to Ms. Tantaros' claims regarding the hostile work environment created by Fox, as discussed in paragraph 10(b) above. *See, e.g., Preuss,* 970 F. Supp. 2d at 186; *Matter of Eastport Assocs., Inc.*, 71 A.D.3d at 891.

Accordingly, we ask that you reconsider your position and confirm that you will produce all non-privileged documents responsive to this Request so that we may avoid burdening the Panel with a motion to compel these documents.

**12. Interrogatory Objections:** If you continue to refuse to respond to these interrogatories, Ms. Tantaros will be forced to move to compel on this issue.

\* \* \*

Given the number of issues raised in this letter, as well as the number of issues raised in the letter that I received from you yesterday evening, we believe that it would be most efficient and productive for the parties to agree to push back the meet and confer deadline by one week to Monday, August 27, 2018 in order to enable each party to fully explore the issues raised by the other parties and prepare to discuss them on a call. We do not believe this change will necessitate altering the schedule for filing the parties' motions to compel, which are currently due on September 7, 2018.

August 17, 2018  
Page 14

VIA E-MAIL

                    Respectfully,

                    Lisa M. Coyle

cc:   Peter Calamari, Esq.  
       Marion Bachrach, Esq.